## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF COLORADO

| | | |
|---|---|---|
| In re: | § | Chapter 13 |
| | § | |
| RACHEL COBURN JOHNSEN, XXX-XX-3397 | § | Case No. 17-21504 TBM |
| Debtor. | § | |

## OBJECTION TO CONFIRMATION OF DEBTOR'S

## CHAPTER 13 PLAN

Red Rocks Credit Union, ("Creditor"), through its attorneys, Weinstein & Riley, P.S., as a secured creditor in these proceedings, for its Objection to Confirmation of the Debtor's Chapter 13 Plan filed December 20, 2017, states and alleges as follows:

1.      Creditor is a member of a class of secured claims contained in the proposed plan. Debtors executed a Promissory Note secured by a recorded Deed of Trust. Creditor's claim is secured by the following property (the "Property")

> LOT 17, BLOCK 1, HAWTHORN SUBDIVISION, COUNTY OF JEFFERSON, STATE OF COLORADO
>
> Property is commonly known as 6182 Eldora St., Golden, Colorado 80403

2.      The Chapter 13 Plan proposed by the Debtor is not confirmable.

3.      The Creditor intends to file a Proof of Claim in the amount of $8,384.60 for pre-petition arrearages. The Debtor's Chapter 13 Plan provides for $4,358.00 in pre-petition arrears.

4.      For the above stated reasons, the Debtor's Chapter 13 Plan is not proposed in good faith. 11 U.S.C. Section 1325(a)(3).

WHEREFORE, Red Rocks Credit Union, respectfully requests that this Court deny confirmation and either convert this case to a Chapter 7 proceeding or dismiss this case pursuant to the provisions of 11 U.S.C. § 1307(c)(5).

Dated: February 6, 2018

Weinstein & Riley, P.S.

By: /s/ Lisa Cancanon
Deanna L Westfall, Registration No. 23449
Lisa Cancanon, Registration No. 42043
Weinstein & Riley, P.S., Eldorado Bldg. 2
11101 West 120th Ave., Suite 280
Broomfield, CO 80021
Phone: 303-539-8607
Email: bncmail@w-legal.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the **Objection to Confirmation of Debtor's Chapter 13 Plan** was served on the following parties by electronic service via the Court's ECF filing system or by first-class mail on February 6, 2018:

**<u>Debtor</u>**
Rachel Coburn Johnsen
6182 Eldora St
Golden, CO 80403-2205

The following parties received notice of the foregoing via the Court's ECF system:

- Mark J. Berumen        notices@berumenlaw.com
- Adam M. Goodman    agoodman13@ecf.epiqsystems.com, mail@ch13colorado.com
- United States Trustee     ustpregion19.dv.ecf@usdoj.gov

/s/ Patricia Rychards

1



**R E D** **R O C K S**™
CREDIT UNION
9325 Dorchester Street, Suite 200
Highlands Ranch, CO 80129
303-471-7625 · FAX 303-471-7650

## NOTE FOR LOANS SECURED BY REAL ESTATE ("Agreement")

In this Agreement, the use of the words "Credit Union", "We", "Us" and "Our" mean RED ROCKS CREDIT UNION. The Borrower(s) and any person(s) signing this Agreement as "Owner of Collateral (other than Borrower)," individually and collectively, are sometimes referred to as "You" or "Your". (e) means an estimate, (n/a) means not applicable. Numbers, phrases or words preceded by a ☐ are applicable only if the ☐ is marked, e.g.☒

| Borrower(s) | JOHNSEN, RACHEL COBURN 234 W 2nd Ave Denver, CO 80223-1407 | Date 6/16/2015 |
|---|---|---|
| | | Account Number |

**Security:** You are giving Us as security a Deed of Trust/Mortgage on Real Property commonly known as:

6182 ELDORA ST                                           GOLDEN, CO 80403

### NOTE SECURED BY REAL PROPERTY

1. ☒ **PROMISE TO PAY.** To repay Your loan, You, jointly and severally, promise to pay RED ROCKS CREDIT UNION or to Our order, seventy-three thousand one hundred and 00/100
   Dollars ($ 73,100.00 ) (principal), plus interest at the rate of (Field left Intentionally Blank)
   Percent ( 6.490% %) per annum, and any other charges and fees due under the terms of this Agreement, in lawful money of the United States. You will pay this sum, at Our office, in monthly installments of principal and interest in the amount of $ 544.84 . You will make these payments every month until You have paid all of the principal and interest and any other charges described below that You may owe under this Agreement. Your first payment is due on 7/16/2015 , and on the same day each month thereafter. You understand that each payment is applied as required by applicable law. If on 6/16/2035 , You still owe amounts under this Agreement, You will pay those amounts in full on that date ("Maturity Date").

   ☐ **PROMISE TO PAY.** To repay Your loan, You, jointly and severally, promise to pay RED ROCKS CREDIT UNION or to Our order,

   Dollars ($ ) (principal), plus interest at the rate of
   Percent ( %) per annum, and any other charges and fees due under the terms of this Agreement, in lawful money of the United States. You will pay this sum, at Our office, in monthly installments of principal and interest in the amount of $ , followed by one final balloon payment in the amount of $ . You will make these payments every month until You have paid all of the principal and interest and any other charges described below that You may owe under this Agreement. Your first payment is due on , and on the same day each month thereafter. You understand that each payment is applied as required by applicable law. If on , You still owe amounts under this Agreement, You will pay those amounts in full on that date ("Maturity Date").

2. **LIABILITY OF PARTIES.** Each person who signs this Agreement as a Borrower agrees to be individually and jointly obligated to pay Your loan in accordance with the terms and conditions of this Agreement. Any person who signs this Agreement and checks the box preceding "Owner of Collateral (other than Borrower)" does so voluntarily and solely to acknowledge the grant of a Deed of Trust/Mortgage in the Real Property identified in this Agreement, but is not personally liable for any indebtedness created by this Agreement.

3. **INTEREST.** Interest will be charged on the unpaid balance of Your loan at the applicable Interest Rate until Your balance is paid in full. Any payment may be made early without penalty, and any early payments will have the result of reducing the total amount of interest paid. Any payment made after the due date will have the result of increasing the total amount of interest paid.

   *The dollar amount of the finance charge disclosed to You for this loan is based upon Your payments being received by Us on the date payments are due. If Your payments are received after the due date, even if received before the date a late charge applies, You may owe additional and substantial money at the end of the loan and there may be little or no reduction of principal. This is due to the accrual of daily interest until a payment is received.*

4. **PAYMENTS.** Your payments are to be made according to this Agreement. Any partial prepayment of Your loan will not delay Your next scheduled payment. If, when You pay Your last scheduled payment, the amount You pay exceeds Your loan balance, then You give the Credit Union permission to deposit the excess to Your share account.

5. **LATE CHARGE.** If Your payment is more than 15 days late, You will be charged 5.00% of the payment past due, subject to a maximum of $25.00.

6. **COLLATERAL.** The Credit Union has been granted a Deed of Trust/Mortgage on the Real Property designated in this Agreement (the subject matter of such a deed or lien is referred to as "Collateral" in this Agreement). Your loan is also secured by any proceeds of the Collateral, insurance proceeds, any insurance premium refunds, and by any assignment of rents. Except for the Credit Union's deed or lien, the Collateral is owned free and clear from any adverse claim, security interest or encumbrance other than as now disclosed to the Credit Union. The Collateral shall be kept in good repair. The Collateral shall not be used for any unlawful purpose. The Credit Union shall receive the full cooperation of the Borrower or Owner in obtaining everything that We require to place and/or maintain Our deed in and/or lien on the Collateral. The Credit Union may examine and inspect the Collateral at any time. All taxes or assessments on the Collateral shall be paid as they come due, and if not paid, the Credit Union may pay them and shall be entitled to reimbursement or, alternatively, to add any amount so paid to the unpaid balance of Your loan subject to the applicable interest rate.

7. **PROPERTY INSURANCE.** You promise to maintain property, fire, and flood insurance (if needed) in an amount that is the lesser of the unpaid balance owed under this agreement or the replacement cost of the improvements, with the Credit Union named as mortgagee for its protection. Such insurance shall protect against loss by fire and other standard perils. You may provide the required property insurance through an existing policy or by a policy You independently obtain and pay for from a person of Your own choosing, providing such person is reasonably acceptable to the Credit Union. You agree to deliver satisfactory evidence of the insurance policy to Us within any time period specified in any notice from Us or on Our behalf. If You do not get or keep this insurance, the Credit Union may, at its sole option, obtain insurance to protect its interest and add its costs to Your loan and You agree to pay for it. The Credit Union is under no obligation to obtain insurance on Your behalf. If the Credit Union does obtain insurance, the cost of obtaining that insurance may be added to Your loan balance, subject to the applicable interest rate. The Credit Union has the authority to obtain, adjust, settle or cancel insurance and may endorse any party's name on any draft.

8. **DEFAULT.** Your loan shall be in default if any of the following things occur: (a) You do not make any payment or perform any obligation under this Agreement or any other agreement that You may have with the Credit Union; or (b) You have made a false or misleading statement in Your credit application and/or in Your representations to the Credit Union; or (c) You die, become insolvent or file for bankruptcy, die, or be involved in any insolvency, receivership or custodial proceeding brought by or against You; and/or (d) the Credit Union should, in good faith, believe Your ability to repay Your indebtedness hereunder is or soon will be impaired, time being of the very essence.

   Upon any occurrence of default, and to the extent permitted by law, We may declare the entire balance of Your loan immediately due and payable, and You understand that interest will continue to accrue at the applicable Interest Rate. If the entire balance is not then paid immediately upon default, the Credit Union may exercise any or all of its rights available at law or equity, or as specified in the Deed of Trust/Mortgage. To the extent permitted by law, the Credit Union shall be reimbursed for all of its costs and expenses, including reasonable attorneys' fees, incurred in the course of collecting any amounts owed under this Agreement or in exercising its rights related to the Collateral. As permitted by law, the Credit Union shall have the right to impress and enforce a statutory lien upon the shares and dividends of any person indebted to it, and We may enforce Our right to do so without further notice to You. Additionally, You agree that We may set-off any mutual indebtedness.

9. **DELAY IN ENFORCEMENT.** We do not lose Our rights under this or any related agreement if We delay enforcing them. We can accept late payments, partial payments, or any other payments, even if they are marked "paid in full" without losing any of Our rights under this Agreement. If any provision of this or any related agreement is determined to be unenforceable or invalid, all other provisions remain in full force and effect.

10. **DEED OF TRUST/MORTGAGE.** See the Deed of Trust/Mortgage for additional terms, including provisions related to transfer of Your interest in the Collateral, which are incorporated herein by reference.

11. **GOVERNING LAW.** You understand and agree that this Agreement will be governed by the laws of the State of Colorado, except to the extent that the laws of the state where the security property is located governs Real Property rights and except to the extent that such laws are inconsistent with controlling federal law.

12. **ASSUMABILITY.** Your loan is not assumable.

**SIGNATURES.** If more than one person signs this Agreement: (a) the term "Borrower(s)" whenever used will mean each person signing below as a Borrower and all of them, and all obligations of Borrower(s) hereunder will be jointly and severally binding upon such persons; (b) We may disburse any of the proceeds of the loan to or upon the instructions of any Borrower; and (c) any notice from Us to any person signing this Agreement, will be deemed to have been given to such person if given to any Borrower selected by Us.

**BY SIGNING BELOW, YOU ACKNOWLEDGE THAT YOU HAVE READ THIS AGREEMENT, THAT YOU UNDERSTAND IT, AND THAT YOU AGREE TO ITS TERMS. YOU ALSO ACKNOWLEDGE THAT YOU HAVE RECEIVED THE DISCLOSURES ON THE SEPARATE PAGE TITLED "TRUTH-IN-LENDING DISCLOSURE STATEMENT" PRIOR TO SIGNING THIS AGREEMENT.**

| | | | |
|---|---|---|---|
| _Rachel Doniso_ | 6/16/15 | | |
| BORROWER | DATE | WITNESS | DATE |

| | | | |
|---|---|---|---|
| BORROWER ☐ Owner of Collateral (other than Borrower) | DATE | WITNESS | DATE |

## LOAN ORIGINATOR & NMLSR ID NUMBER INFORMATION

| *Individual Loan Originator's Name* | *Nationwide Mortgage Licensing System And Registry (NMLSR) Identification (ID) Number* |
|---|---|
| Catherine Alvarez | 464531 |
| *Loan Originator Organization's Name* | *Nationwide Mortgage Licensing System And Registry (NMLSR) Identification (ID) Number* |
| Red Rocks Credit Union | 412773 |

Copyright Oak Tree Business Systems, Inc., 2008-2014. All Rights Reserved.     OTBS 122 REDR (2/14)

2015068960          7/6/2015 12:41 PM
PGS   12            $66.00      DF $0.00
Electronically Recorded Jefferson County, CO
Faye Griffin, Clerk and Recorder          TD1000  N

After Recording Return To:
Red Rocks Credit Union
9325 Dorchester, Suite 200
Highlands Ranch, CO 80129

————— Space Above This Line For Recording Data] —————

# DEED OF TRUST

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21.  Certain rules regarding the usage of words used in this document
are also provided in Section 16.

(A) **"Security Instrument"** means this document, which is dated 6/16/2015
together with all Riders to this document.
(B) **"Borrower"** is

Rachel Johnsen

Borrower is the trustor under this Security Instrument.
(C) **"Lender"** is **Red Rocks Credit Union**. Lender is a **Credit Union** organized and existing under
the laws of **the State of Colorado**. Lender's address is **9325 Dorchester Street, Suite 200**
**Highlands Ranch, CO 80129**. Lender is the beneficiary under this Security Instrument.
County, Colorado.
(D) **"Trustee"** is the Public Trustee of JEFFERSON
(E) **"Note"** means the promissory note signed by Borrower and dated  6/16/2015
The Note states that Borrower owes Lender
seventy-three thousand one hundred and 00/100
Dollars (U.S. $ 73,100.00          ) plus interest.  Borrower has promised to pay this debt in regular
Periodic Payments and to pay the debt in full not later than 6/16/2035
(F) **"Property"** means the property that is described below under the heading "Transfer of Rights in
the Property."
(G) **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late
charges due under the Note, and all sums due under this Security Instrument, plus interest.
(H) **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The
following Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider      ☐ Condominium Rider        ☐ Second Home Rider
☐ Balloon Rider Planned Unit  ☐ Development Rider         ☐ Other(s) [specify]
☐ 1-4 Family Rider           ☐ Biweekly Payment Rider   _____

(I) **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable
final, non-appealable judicial opinions.
(J) **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments
and other charges that are imposed on Borrower or the Property by a condominium association,
homeowners association or similar organization.

(page 1 of 12)

**(K)** **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L)** **"Escrow Items"** means those items that are described in Section 3.

**(M)** **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N)** **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O)** **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P)** **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q)** **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower, in consideration of the debt and the trust herein created, irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the _____:

County _____ of JEFFERSON _____
     [Type of Recording Jurisdiction]                    [Name of Recording Jurisdiction]

Lot 17, Block 1, Hawthorn Subdivision, County of Jefferson, State of Colorado

which currently has the address of 6182 ELDORA ST                              GOLDEN
                                          [Street]                              [City]

Colorado  80403                         ("Property Address");
          [Zip Code]

     TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

(page 2 of 12)

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record and liens for taxes for the current year not yet due and payable.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance

(page 3 of 12)

premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender

(page 4 of 12)

may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument,

(page 5 of 12)

and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If: (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument; (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations); or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason,

the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured

(page 7 of 12)

by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from

Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

(page 9 of 12)

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Note is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of: (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge; (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance; and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give written notice to Trustee of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Lender shall mail a copy of the notice to Borrower as provided in Section 15. Trustee shall record a copy of the notice in the county in which the Property is located and shall mail copies of notice of sale for the time and in the manner provided by Applicable Law and to the other the notice of sale in the manner prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder for cash at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's certificate describing the Property and the time the purchaser will be entitled to Trustee's deed. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall request that Trustee release this Security Instrument and shall produce for Trustee, duly cancelled, all notes

(page 11 of 12)

evidencing debts secured by this Security Instrument. Trustee shall release this Security Instrument without further inquiry or liability. Borrower shall pay any recordation costs and the statutory Trustee's fees.

**24. Waiver of Homestead.** Borrower waives all right of homestead exemption in the Property.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____    _Rachel Johnsen_____(Seal)
                                                              -Borrower
                             Rachel Johnsen

_____    _____(Seal)
                                                              -Borrower

_____    _____(Seal)
                                                              -Borrower

_____    _____(Seal)
                                                              -Borrower

STATE OF COLORADO,                    Adams        County ss:
         The foregoing instrument was acknowledged before me this 16 day of June 2015 .
by Rachel Johnsen.

         Witness my hand and official seal.
         My commission expires:                    _____
                                                              Notary Public

KEITH D. ALLEN
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20014023027
My Commission Expires July 28, 2017

LOAN ORIGINATOR & NMLSR ID NUMBER INFORMATION

| Individual Loan Originator's Name | Nationwide Mortgage Licensing System And Registry (NMLSR) Identification (ID) Number |
|---|---|
| Catherine Alvarez | 464531 |
| Loan Originator Organization's Name | Nationwide Mortgage Licensing System And Registry (NMLSR) Identification (ID) Number |
| RED ROCKS CREDIT UNION | 412773 |

OTBS 093A CO (2/05)                                        (page 12 of 12)

Recording Requested By and
When Recorded Mail to:

SunStreet Energy Group, LLC
730 NW 107 Avenue, 4th Floor
Miami, Fl. 33172

---

(SPACE ABOVE THIS LINE FOR RECORDER'S USE)

## MEMORANDUM OF SOLAR 20/20 PLAN AGREEMENT AND COVENANTS

**THIS REAL PROPERTY IS RECEIVING PART OF ITS ELECTRIC SERVICE FROM AN INDEPENDENT SOLAR ENERGY PRODUCER THAT HAS RETAINED OWNERSHIP OF A SOLAR ELECTRIC GENERATION SYSTEM THAT IS LOCATED ON THE REAL PROPERTY. THE INDEPENDENT SOLAR ENERGY PRODUCER PROVIDES ELECTRIC SERVICE TO THE CURRENT OWNER OF THIS REAL PROPERTY THROUGH A LONG-TERM CONTRACT FOR ELECTRIC SERVICE KNOWN AS THE SOLAR 20/20 PLAN AGREEMENT AND COVENANTS.**

This Memorandum of Solar 20/20 Plan Agreement and Covenants, dated as of June 16 , 2015, is between Rachel Johnsen (**"Homeowner"**) and SunStreet Energy Group, LLC, a Delaware limited liability company (**"Company"**).

1.       Company and Homeowner entered into a Solar 20/20 Plan Agreement and Covenants (the "**Agreement**") dated as of June 16 , 2015. All capitalized terms not otherwise defined herein shall have the meanings set forth for such terms in Agreement.

2.       Company owns and holds title to the solar photovoltaic system and component parts consisting of: solar panels and hardware, racking system rails and hardware, micro-inverters, trunk line and array ground wire, and mounting foot 'L' bracket (collectively, the **"PV System"**) installed on the rooftop of the residence located at the following address: 6182 Eldora Street, Golden CO 80403 (**"Home"**) at the real property described on Exhibit A, attached hereto (the "**Property**"), which Property is owned by Homeowner.

3.       The Agreement provides, among other things, for the sale of generated electricity from the PV System to Homeowner by Company. The Homeowner agrees to purchase all of the electricity generated by the PV System, regardless of the amount of electricity consumed at the Home, and any credits due to Homeowner or charges owed by Homeowner as a result of net metering programs will only appear on the Homeowner's bill from the Local Electric Utility.

4.       The term of the Agreement is from the later of the Placed in Service Date and the Close of Escrow (as such terms are defined in the Agreement) to the end of the twentieth (20th) year after the first day of the calendar month following the Placed in Service Date of the PV System (unless terminated earlier pursuant to the terms of the Agreement or extended by mutual agreement of Homeowner and Company).



Cost Center ▮▮▮▮▮▮▮▮
SunStreet S▮▮▮▮▮▮▮▮

8/20/14

5.      Upon the occurrence of a default by Company under the Agreement, Homeowner may (a) terminate the Agreement and request removal of the PV System by Company, or (b) exercise any other remedies available at law or equity.

6.      Upon the occurrence of default by Homeowner under the Agreement, Company may do any one or more of the following: (a) suspend its performance under the Agreement until the default has been cured, (b) terminate the Agreement and the Homeowner's rights to use the PV System and the generated electricity, (c) leave the PV System on the Home but sell the generated electricity to a third party, (d) remove the PV System Component Parts (as such term is defined in the Agreement) from the Home, (e) exercise any other remedies available at law or equity, and/or (f) recover the lesser of the following two amounts: (i) the net present value of the remaining payments due under the Agreement, *plus* the value of any Renewable Energy Incentives lost or recaptured as a result of Homeowner's default, *less* any amounts Company recovers or reasonably expects to recover from the wholesale sale of power to the Local Electric Utility, and (ii) the amount calculated pursuant to Annex IV of the Agreement.

7.      If Homeowner sells the Property, Homeowner may either:

a.      Purchase the PV System, or have the buyer of the Property purchase the PV System, at the price set forth in Annex IV to the Agreement, and then include the system with the sale of the Property; or

b.      Enter into an agreement with the buyer of the Property to assume all of Homeowner's obligations under the Agreement in accordance with the terms of the Agreement.

8.      Notwithstanding anything to the contrary contained herein or in any Agreement, in the event that (A) the Home shall be owned by any person or entity exercising the rights of a "mortgagee in possession" of such Home (a "**MIP**"), and (B) the Agreement shall have been terminated, whether by operation of law, in accordance with the Agreement or otherwise, then at the written request of the MIP or a subsequent purchaser of the Home from the MIP, Company shall enter into the Agreement with such MIP or subsequent purchaser of the Home on terms and conditions no less favorable to the owner of the Home as those contained in the existing Agreement, including but not limited to, the right to purchase electrical energy and to transfer the Agreement to any purchaser of the Home on the same terms and conditions.

9.      This Memorandum of Solar 20/20 Plan Agreement and Covenants is subject to all of the terms, covenants and conditions provided in the unrecorded Agreement and in no way modifies the provisions of the Agreement. If the terms of this Memorandum are inconsistent with the terms of the Agreement, the terms of the Agreement shall prevail. This Memorandum may be executed in one or more counterparts, each of which, when so executed and delivered, shall be deemed an original, but all of which, taken together, shall constitute one and the same instrument.

10.     The parties acknowledge and agree that the PV System constitutes the personal property of Company, including, without limitation, under Article 9 of the Uniform Commercial Code of Colorado.

[SIGNATURES TO MEMORANDUM OF SOLAR 20/20 PLAN

AGREEMENT AND CONVENANTS ON NEXT PAGES]

-2-

Cost Cent██████████████
SunStreet Solar Home Program

8/20/14

[SIGNATURE PAGE TO MEMORANDUM OF SOLAR 20/20 PLAN

AGREEMENT AND COVENANTS]

IN WITNESS WHEREOF, the parties have executed this Memorandum of Solar 20/20 Plan
Agreement and Covenants as of _____June 16_____, 2015.

**HOMEOWNER:**

Signature: _____Rachell Johnsen_____

Name: _____Rachel Johnsen_____

Signature: _____

Name: _____

State of Colorado          )
                           ) ss.
County of Adams            )

The foregoing was acknowledged before me this __16__ day of __June__, 2015, by
_Rachel Johnsen_.

Witness my hand and official seal.

My commission expires: _____

_____
Notary Public

KEITH D. ALLEN
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20014023027
My Commission Expires July 28, 2017

State of Colorado          )
                           ) ss.
County of _____         )

The foregoing was acknowledged before me this _____ day of _____, 2015, by
_____.

Witness my hand and official seal.

My commission expires: _____

_____
Notary Public

-3-

Cost Center ███████
SunStreet S███ ███

[SIGNATURE PAGE TO MEMORANDUM OF SOLAR 20/20 PLAN
AGREEMENT AND COVENANTS]

**COMPANY:**

SUNSTREET ENERGY GROUP, LLC,
a Delaware limited liability company

By: _____

Name:  Elizabeth Gherardi

Title:  Authorized Signatory

STATE OF FLORIDA
COUNTY OF MIAMI-DADE COUNTY

On <u>May 27th</u>, 2015, before me, Sasha Kayla Mendoza, personally appeared Elizabeth Gherardi, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her authorized capacity, and that by her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of Florida that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature: _____
Notary Public

Notary Public State of Florida
Sasha Kayla Mendoza
My Commission EE 172227
Expires 02/22/2016

-4-

8/20/14

Cost Cente
SunStreet

## EXHIBIT A

## LEGAL DESCRIPTION OF THE PROPERTY

Real property in the Town of Golden, County of Jefferson, State of Colorado, described as follows:

Lot 17, Block 1
Hawthorn Subdivision
County of Jefferson, State of Colorado.

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO:   (Name and Address)

SunStreet Energy Group, LLC
730 NW 107 Avenue, 4th Floor
Miami, Fl 33172
Attn: Elizabeth Gherardi

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR  1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| Johnsen | Rachel | | |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 6182 Eldora Street | Golden | CO | 80403 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR  2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| | Golden | CO | 80403 | USA |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| SunStreet Energy Group, LLC, a Delaware limited liability company | | | |
| OR  3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 730 NW 107 Avenue | Miami | Fl | 33172 | |

4. COLLATERAL: This financing statement covers the following collateral: That certain photo-voltaic solar electric generation system (the "PV System") installed on behalf of the Secured Party at the address of the Debtor set forth above. The filing of this financing statement shall not, and shall not be deemed in any way to, imply that the PV System is a fixture, as it is the express intent of the Secured Party and Debtor that the PV System be deemed to not be a fixture under applicable law, nor to create any relationship between the Secured Party and the Debtor other than that created by that certain Solar 20/20 Plan Agreement and Covenants, dated as of 6/16/15 , between Secured Party and Debtor (as the same may have been amended, restated or otherwise modified from time to time). Accordingly, this financing statement has been filed as a precaution solely to give notice to all persons that the PV System is owned by the Secured Party and that the Debtor has no ownership interest therein and that the PV System is not a fixture.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:  ☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:  ☐ Agricultural Lien  ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable):  ☑ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

International Association of Commercial Administrators (IACA)

**EXHIBIT A**

**LEGAL DESCRIPTION OF THE PROPERTY**

Real property in the Town of Golden, County of Jefferson, State of Colorado, described as follows:

Lot 17, Block 1
Hawthorn Subdivision
County of Jefferson, State of Colorado.



RED ROCKS CU

RED ROCKS CU
8195 SOUTHPARK LANE
LITTLETON, CO  80120

JOHNSEN, RACHEL COBURN

234 W 2nd Ave

Denver, CO  80223-1407

Account History ██████████████

Filter - Date frm: 06-25-2015 to: 01-17-2018

| Date | Description | Transaction | Principal | Interest | Fee | Balance |
|---|---|---|---|---|---|---|
| 06/25/15 | New Loan     : G/L Entry | 10.25 | -10.25 | | | 10.25 |
| | LOAN PROCESSING/FILING FEES | | | | | |
| 06/25/15 | New Loan     : G/L Entry | 73089.75 | -73089.75 | | | 73100.00 |
| | OUTGOING WIRE - JOHNSEN, RACHEL | | | | | |
| 07/09/15 | Payment      : ACH | 544.84 | 245.89 | 298.95 | | 72854.11 |
| | Red Rock CU-Second Mor | | | | | |
| 07/31/15 | Payment      : ACH | 544.84 | 259.85 | 284.99 | | 72594.26 |
| | Red Rock CU-Funds Tran | | | | | |
| 09/01/15 | Payment      : ACH | 544.84 | 131.79 | 413.05 | | 72462.47 |
| | Red Rock CU-Funds Tran | | | | | |
| 11/06/15 | Payment      : ACH | 544.84 | | 519.84 | 25.00 | 72462.47 |
| | Red Rock CU-October Pa | | | | | |
| 11/06/15 | Memo Tran | 0.00 | | | | 72462.47 |
| | Late Fee - Paid: $25.00 | | | | | |
| 11/09/15 | Payment      : ACH | 544.84 | 175.66 | 369.18 | | 72286.81 |
| | Red Rock CU-November P | | | | | |
| 12/02/15 | Payment      : ACH | 544.84 | 249.22 | 295.62 | | 72037.59 |
| | Red Rock CU*Dec Paymen | | | | | |
| 01/11/16 | Payment      : ACH | 544.84 | 32.48 | 512.36 | | 72005.11 |
| | Red Rock CU*Funds Tran | | | | | |
| 03/08/16 | Payment      : ACH | 544.84 | | 519.84 | 25.00 | 72005.11 |
| | Red Rock CU*Funds Tran | | | | | |
| 03/08/16 | Memo Tran | 0.00 | | | | 72005.11 |
| | Late Fee - Paid: $25.00 | | | | | |
| 04/13/16 | Payment      : ACH | 544.84 | | 519.84 | 25.00 | 72005.11 |
| | Red Rock CU*Funds Tran | | | | | |
| 04/13/16 | Memo Tran | 0.00 | | | | 72005.11 |
| | Late Fee - Paid: $25.00 | | | | | |
| 04/27/16 | Payment      : ACH | 545.00 | 214.75 | 330.25 | | 71790.36 |
| | Red Rock CU*Funds Tran | | | | | |
| 06/08/16 | Payment      : ACH | 544.84 | | 519.84 | 25.00 | 71790.36 |
| | Red Rock CU*Funds Tran | | | | | |
| 06/08/16 | Memo Tran | 0.00 | | | | 71790.36 |
| | Late Fee - Paid: $25.00 | | | | | |

Printed:01/19/18 09:52:

Account History For: ▮▮▮▮▮▮▮▮▮▮

Filter - Date frm: 06-25-2015 to: 01-17-2018

| Date | Description | Transaction | Principal | Interest | Fee | Balance |
|---|---|---|---|---|---|---|
| 06/28/16 | Payment    : ACH<br>Red Rock CU*Funds Tran | 544.84 | 273.25 | 271.59 | | 71517.11 |
| 08/02/16 | Payment    : ACH<br>Red Rock CU*Funds Tran | 544.84 | 74.77 | 445.07 | 25.00 | 71442.34 |
| 08/02/16 | Memo Tran<br>Late Fee - Paid: $25.00 | 0.00 | | | | 71442.34 |
| 08/31/16 | Payment    : ACH<br>Red Rock CU*Funds Tran | 544.84 | 176.45 | 368.39 | | 71265.89 |
| 01/09/17 | Payment    : ACH<br>Red Rock CU*Funds Tran | 1634.52 | | 1559.36 | 75.16 | 71265.89 |
| 01/09/17 | Memo Tran<br>Late Fee - Paid: $75.16 | 0.00 | | | | 71265.89 |
| 01/31/17 | Payment    : ACH<br>Red Rock CU*Funds Tran | 545.00 | 140.75 | 379.41 | 24.84 | 71125.14 |
| 01/31/17 | Memo Tran<br>Late Fee - Paid: $24.84 | 0.00 | | | | 71125.14 |
| 02/28/17 | Payment    : ACH<br>Red Rock CU*Funds Tran | 544.88 | 165.77 | 354.11 | 25.00 | 70959.37 |
| 02/28/17 | Memo Tran<br>Late Fee - Paid: $25.00 | 0.00 | | | | 70959.37 |
| 01/05/18 | Payment    : ACH<br>Red Rock CU*Funds Tran | 544.84 | | 519.48 | 25.36 | 70959.37 |
| 01/05/18 | Memo Tran<br>Late Fee - Paid: $25.36 | 0.00 | | | | 70959.37 |
| 01/09/18<br>01/05/18 | Pmt Reverse<br>01-05-2018 Payment Reversed | -544.84 | | -519.48 | -25.36 | 70959.37 |
| 01/17/18 | Payment    : ACH<br>Red Rock CU*Funds Tran | 544.84 | | 519.48 | 25.36 | 70959.37 |
| 01/17/18 | Memo Tran<br>Late Fee - Paid: $25.36 | 0.00 | | | | 70959.37 |

| Total Transactions: 32 | | | -70959.37 | 8481.17 | 275.36 | |

Total Payments:       11442.00    Average Balance:        71545.54

Total Draws:       73100.00